AO-106 (Rev. 06/09)-Application For Search Warrant



# UNITED STATES DISTRICT COURT

DEC 06 2023

for the



Northern District of Oklahoma

| | | |
|---|---|---|
| In the Matter of the Search of *a Red Apple iPhone, Apple iPhone with White Graphic Case, Red Apple iPhone, White Apple iPhone, Blue Apple iPhone, Rose Gold Apple iPhone, and Silver Samsung Flip Phone, Currently Stored at the Tulsa Police Department Property Room* | ) ) ) ) ) ) | Case No. 23-MJ-671-SH FILED UNDER SEAL |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment "A"

located in the ___Northern___ District of ___Oklahoma___, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in Possession of a Firearm or Ammunition |
| 18 U.S.C. § 922(d) | Disposing of Firearm or Ammunition to a Person Under Indictment or Convicted Felon |
| 18 U.S.C. § 924(b) | Transporting or Receiving a Firearm or Ammunition in Interstate Commerce with Intent to Commit a Felony |
| 18 U.S.C. § 924(h) | Conspiring to Transfer or Receive a Firearm or Ammunition to Commit a Felony |

The application is based on these facts:

**See Affidavit of Ben Nechiporenko, attached hereto.**

☑ Continued on the attached sheet.

☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

SA Ben Nechiporenko, ATF
*Printed name and title*

Subscribed and sworn to by phone.

Date: 12/6/23

_____
*Judge's signature*

City and state: Tulsa, Oklahoma

Susan E. Huntsman, U.S. Magistrate Judge
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| In the Matter of the Search of a Red Apple iPhone, Apple iPhone with White Graphic Case, Red Apple iPhone, White Apple iPhone, Blue Apple iPhone, Rose Gold Apple iPhone, and Silver Samsung Flip Phone, Currently Stored at the Tulsa Police Department Property Room | Case No. _____ |

### Affidavit in Support of an Application
### Under Rule 41 for a Warrant to Search and Seize

I, Ben Nechiporenko, being first duly sworn under oath, depose and state:

### Introduction and Agent Background

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a federal law enforcement officer as defined under Rule 41(a)(2)(C) and am authorized to request this search warrant because I am a government agent who is engaged in enforcing federal criminal laws and I am within the category of officers authorized by the Attorney General to request such a warrant.

3. I have been employed as a Special Agent in Tulsa, Oklahoma since 2022. I am currently assigned to the Dallas Field Division, Tulsa Field Office with the

Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). As a result of my employment with ATF, my duties include, but are not limited to, the investigation and enforcement of illegals use, possession, and trafficking of firearms, criminal organizations and gangs, arson, and illegal use and possession of explosives.

4. Prior to my tenure as an ATF Special Agent, I was a sworn law enforcement officer employed with the West Fargo Police Department in North Dakota from October 2012 to January 2022. During my employment with the West Fargo Police Department, my primary assignments included: Patrol Officer with the Patrol Division, Detective for the Metro Street Crimes Unit with the Special Investigations Division, Task Force Officer and Team Leader with U.S. Marshals Service Violent Offender and Fugitive Task Force, and Patrol Sergeant with the Patrol Division. My training included over 1,250 hours of Police Officer Standards & Training (POST) approved training hours with an emphasis in gangs and narcotics enforcement. I served nine years with the Army National Guard as a Combat Engineer and received an Honorable Discharge at the rank of Sergeant. I received a Bachelor of Science Degree in Criminal Justice from North Dakota State University in 2011.

5. As part of my duties as an ATF Special Agent, I investigate criminal violations in the Northern District of Oklahoma to include Title 18 U.S.C. § 922(g)(1) – Felon in Possession of a Firearm or Ammunition, Title 18 U.S.C. § 922(d)- Disposing of Firearm or Ammunition to a Person Under Indictment or Convicted Felon, Title 18 U.S.C. § 924(b)- Transporting or Receiving a Firearm or Ammunition in Interstate

Commerce with Intent to Commit a Felony, and Title 18 U.S.C. § 924(h)-
Conspiring to Transfer or Receive a Firearm or Ammunition to Commit a Felony.

6. I am familiar with the facts and circumstances of this investigation. The facts
set forth in this affidavit are based on my personal observations, knowledge obtained
from other law enforcement officers, my review of documents related to this
investigation, conversations with others who have personal knowledge of the events
and circumstances described herein, and a review of open-source information
including information available on the Internet. Because this affidavit is submitted
for the limited purpose of establishing probable cause in support of the application
for a search warrant, it does not set forth each and every fact I or others have learned
during the course of this investigation.

7. Based on my training, experience, and the facts set forth in this affidavit, there
is probable cause to believe that evidence of violations of Title 18 U.S.C. § 922(g)(1)
– Felon in Possession of a Firearm or Ammunition, Title 18 U.S.C. § 922(d)-
Disposing of Firearm or Ammunition to a Person Under Indictment or Convicted
Felon, Title 18 U.S.C. § 924(b)- Transporting or Receiving a Firearm or Ammunition
in Interstate Commerce with Intent to Commit a Felony, and Title 18 U.S.C. §
924(h)- Conspiring to Transfer or Receive a Firearm or Ammunition to Commit a
Felony.

**Identification of the Device to be Examined**

8. The property to be searched is a red Apple iPhone, a Apple iPhone with white graphic case, a red Apple iPhone, a white Apple iPhone, a blue Apple iPhone, a rose gold Apple iPhone, and a silver Samsung flip phone, hereinafter the "Devices." The Devices are currently stored at the Tulsa Police Department Property Room in Tulsa, Oklahoma.

9. The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

**Probable Cause**

10. On September 16th, 2023, officers with the Tulsa Police Department PM Impact Unit were performing routine proactive patrol in downtown Tulsa, Oklahoma, in an effort to reduce violent crime.  Part of the duties of the PM Impact Unit is to patrol the downtown bar district on Friday and Saturday night.  During these patrols, the PM Impact Unit routinely seizes firearms and narcotics, and encounters criminal street gang members.  The PM Impact Unit has investigated shootings, burglaries, robberies, gang-related offenses, assaults, and narcotics conspiracies in the area.

11. PM Impact officers are aware that the downtown area is busier on weekends with members of the public frequenting bars, music concerts, and sporting events.

4

12. At approximately 1:44 a.m., PM Impact officers were on patrol in the parking lot located to the south of Ruby Red's Nightclub, 321 East Reconciliation Way, Tulsa, Oklahoma. Officers observed five males standing around a black 2008 Dodge Charger (AR Tag APX64Y) and a black 2016 Honda Accord (AR Tag 546ZPF).

13. Officers parked their patrol unit in a nearby alley, out of sight of the parking lot and far enough away from the vehicle that the congregating males could have driven off or walked away if they decided to do so. The officers approached the group on foot and as they approached the group, the males immediately turned away, spread out, and moved away from the vehicles.

14. Officers approached the driver-side vehicle of the Charger and, in plain view, saw multiple high-capacity firearms sitting on the center console. The individuals outside the cars attempted to leave the area and were told to stop. They were identified as Christopher Yahir MARTINEZ (DOB XX/XX/2003), Christopher Marcus SABB (DOB XX/XX/2004), Darmel Dashun BATEMON Jr. (DOB XX/XX/2002), Kalob Nathaniel BURTON (DOB XX/XX/2000), and Luis Gerardo TREJO-ZAMBRANO (DOB XX/XX/2001).

15. The Honda Accord was occupied by three males, Bryan Ulysses MARTINEZ (DOB XX/XX/2005) in the driver's seat, Marcos ZAMBRANO-RIVERA Jr. (XX/XX2002) in the rear driver's-side seat, and Luis Antonio SORIA (DOB XX/XX/2002) in the rear passenger-side seat. Officers smelled the odor of marijuana coming from inside the vehicle as they approached it. Officers observed in plain view a firearm on the driver-side rear passenger floorboard of the Honda.

5

The eight males were detained for suspicion of being in possession of illegal firearms and possession of firearms while intoxicated.

16. The Honda Accord was searched and officers recovered several firearms, to include a chamber and magazine loaded Walther Arms, IWI Uzi Rifle, Serial #WI018714, from the rear driver-side floor; a magazine loaded Palmetto State Armory, Dagger Compact, Serial #JJE37863, with a possible silencer attached to the barrel, from the front passenger-side floor; a magazine loaded Romarm/Cugir, Micro Draco, Serial #PMD1829120ROA, from the front passenger-side floor; a chamber and magazine loaded pistol, Glock, Model 27, Serial #XRG993, from the back passenger seat pocket; and a magazine loaded pistol, Glock, Model 19, Serial #BTWU743, from the back passenger seat pocket. Body armor was recovered from the back passenger seat.



*Figure 1 Honda Accord Firearms Location*

17. The Dodge Charger was searched and officers recovered several firearms, to include, a chamber and magazine loaded Palmetto State Armory, PA-15, Serial #SCD443583, from top of the center console; a chamber and magazine loaded Zastava, PAP M85 PV, Serial #M85PV001787, from the front passenger seat; a chamber and high-capacity drum magazine loaded Anderson Manufacturing, AM-15 Serial #22021725, from the rear driver-side floor; a chamber and magazine loaded Romarm/Cugir, Micro Draco, Serial #ROA22PMD38632, from the rear passenger-side seat; and a chamber and magazine loaded Century Arms International, VSKA, Serial #SV7P011101, from the rear passenger-side floor.



*Figure 2 Dodge Charger Firearms Location*

18. While securing the firearms, officers observed drug paraphernalia in the black Honda Accord, specifically a rolling tray and a THC vape pen in the driver-side door handle. Based on the totality of the circumstances, officers performed a search of both vehicles. In the Honda Accord, officers recovered a zip lock bag with apparent oxycodone pills from the glovebox, and a plastic bag with several small pieces torn out was recovered from the passenger seat rear pocket. These plastic bags are often used by drug dealers to create bindles to sell drugs. The pills were confirmed as oxycodone by the Tulsa Police Department Forensic Laboratory. From the Dodge Charger, officers located a black backpack in the trunk that contained marijuana, a functional digital scale, an empty .40 caliber pistol magazine, and the wallet for BATEMON.

19.  Officers searched the individuals and recovered a small bag of marijuana, from SABB and BATEMON. ZAMBRANO, Bryan MARTINEZ, BATEMON, and SABB all possessed face masks or face coverings. Additionally, they recovered $3549 in cash, primarily comprised of $20 and $100 bills, from SABB.

20. Several cell phones were recovered during the searches of the vehicles and persons and booked into property at the Tulsa Police Department Property Room. The phones were booked under Property Receipt Number BU9984 with individual item numbers reflecting where the phones were recovered. The phones include a red Apple iPhone located on Christopher MARTINEZ (Item #27); an Apple iPhone with a white graphic case located on Darmel BATEMON (Item #28); a red Apple iPhone located on SORIA (Item #29); a white Apple iPhone located on Christopher SABB (Item #32); a blue Apple iPhone located in backpack in trunk of Dodge Charger (Item #36); a rose gold Apple iPhone dropped by Bryan MARTINEZ onto driver side floorboard of Honda Accord when taken into custody (Item #42); and a Samsung Flip Phone (Item #43) located in rear passenger side door pocket in Honda Accord.

21. Officers read Miranda Warnings to all eight males who agreed to provide a voluntary statement.  Statements were collected from all eight individuals. Summaries of the statements are below:

- SABB: He had a large amount of cash on him because he was recently in a car accident and was paid after a lawsuit; the black Dodge Charger belonged to his brother who lent him the car to come to Tulsa; he came to

9

Tulsa to go to the club; this was his first time coming to Tulsa; he came to Tulsa with all of his friends from Arkansas; he knew all the individuals in the group; none of the guns in his car belonged to him; he knew there were guns scattered all over his car; he did not wish to say who the guns belonged to; he smokes marijuana and the last time he smoked was yesterday; he did not have a medical marijuana card; he did not have a medical condition.

- ZAMBRANO-RIVERA: He is from Fayetteville, Arkansas; he was in the black Honda Accord; he knew all the other individuals on scene because they were from Arkansas; all of the individuals there were his friends; he came to Tulsa today and planned on making this a day trip; he was going to travel back home after leaving the bar; they had a couple of drinks in the bar, and they were going to leave; he did not drink or smoke anything that night; he didn't remember what time they arrived at Ruby Red's and that it was still light out when they arrived; he saw the firearms but did not know who they belonged to; all the guns were already there when he was sitting in the car; he was sitting in the "passenger back side;" he was not sure who those pills belonged to; stated he met the individuals not in their car there at the bar; and none of the masks found in the vehicle belonged to him and were already there.

- Christopher MARTINEZ: He believed it was legal to be in possession of marijuana and in possession of a firearm in Arkansas; Arkansas has

10

legalized the use of medical marijuana; he had a medical marijuana card and did not have the card on him; the last time that he smoked marijuana was in the morning and he did not feel intoxicated; he came to Tulsa from Arkansas for the purpose of going to the club with his friend who lives in Oklahoma, Luis TREJO-ZAMBRANO; he did not consume any alcoholic beverages today; the police contacted them before they were able to start drinking; he was the driver of the black Charger; the car belonged to SABB, but he was driving since he had a driver's license; they arrived at Ruby Red's at approximately 0030 hours or 0100 hours; no one in the black Charger was a felon; the Draco with a clear-clip belonged to him; he did not know which gun belonged to what person; Little Rock was high crime and he has had friends that have been shot; the marijuana located in the black Charger did not belong to him; he did not know who the pills in the black Honda belonged to; and Luis TREJO-ZAMBRANO had a bad drug problem but did not sell the pills.

- SORIA: He is from Arkansas and came to Tulsa to go to the club; they were going to leave for Arkansas the next day; he was in the black Honda; he was seated in the back passenger seat; they had just got to the club; none of the firearms belonged to him; he did not know who the guns belonged to; he did not know who the body armor belonged to; he did see the body armor; the body armor was sitting in the back with him the whole time on

11

their way to Tulsa; he was not a prohibited person; he did not know who the pills belonged to; he was not a drug dealer or user.

- BURTON: He was dropped off by his brother in the parking lot; he knows a couple of the subjects and just met others; he was not in either of the two cars; he was dropped off by his brother in a Chrysler; he got to Tulsa with his brother, BATEMON; he did not see any guns in the vehicles; his wallet was inside of the black Charger; he threw his wallet in the back passenger window of the Charger but never went inside and never saw any guns; he set his wallet down so he could go into the club; he does not use drugs; he was on probation and was not supposed to be around guns.

- BATEMON: He was in possession of tobacco; he was only 20 years old; he purchased the vape pen in Arkansas; he arrived at the parking lot of Ruby Red's bar with his brother, BURTON; the two were dropped off by their older brother who left prior to the police encounter; the vehicle he was dropped off in was a Nissan; he was only in the parking lot for 10-15 minutes before police contacted them; he was not in any of the two cars in the parking lot; he is a user of marijuana; he does not have medical marijuana and had no medical condition; he uses marijuana about every two weeks; he last smoked marijuana yesterday; he put his keys in a backpack located in the black Dodge Charger; the backpack was in the back seat behind the passenger seat; he was never in the black Honda; none of the guns belonged to him; he didn't know who the guns belonged to;

12

admitted the marijuana in his pocket belonged to him; he was not a prohibited person; he was recently arrested and released a couple of days ago on a warrant; the warrant was for battery; he did not want to specify what happened.

- TREJO-ZAMBRANO: He knew all the people in the group, they were all friends; he got a ride from Watts, Oklahoma to Tulsa, Oklahoma, by a family member; though he later recanted and stated he was dropped off by a friend; they were hanging out in the parking lot for approximately 15 minutes before police contacted them; none of the guns belonged to him; he did not know who the guns belonged to; he did not know who the pills belonged to; he was arrested for guns and drugs approximately a year ago; and he lives in Watts, Oklahoma;

- Bryan MARTINEZ: He lives in Springdale Arkansas; he was the driver of the black Honda; the only people he knew in the group were TREJO-ZAMBRANO, SORIA, and ZAMBRANO; they arrived at Ruby Red's at about 0000 hours; TREJO-ZAMBRANO was in the front passenger seat, ZAMBRANO was in the back seat behind the driver, and SORIA was in the back seat in the passenger seat; he did not consume alcohol or drugs; he does not use any illegal substances; he didn't know the individuals in the black Charger, only TREJO-ZAMBRANO knew them; none of the guns found belonged to him; he did know there were guns in his car; the guns were in his car for safety reasons; everyone not in the Honda Accord was

13

in the Charger; he saw them get in and out of the Charger; the pills belonged to SORIA, who is a drug user, and he saw SORIA with this bag previously; TREJO-ZAMBRANO also goes by "Goon" had been robbed recently and the guns were only for protection.

22. All eight males were booked into David L. Moss for various firearms and drug related state and municipal charges.

23. None of the males are members of a Native American tribe.

24. After the individuals were booked into David L. Moss, law enforcement became aware of their connection to several on-going investigations.

25. Catoosa Police Department responded to the Laquinta Inn and Suites, 2009 South Cherokee Street, Catoosa, Oklahoma on September 10, 2023, at approximately 6:59 a.m. TREJO-ZAMBRANO reported he went with a female, N.R., to the hotel. He got a room with N.R. and fell asleep. TREJO-ZAMBRANO woke up to three men holding guns to his head who took his jewelry and approximately $1,500 in cash. Catoosa Police observed video surveillance footage from the Laquinta that showed N.R. and TREJO-ZAMBRANO getting a room together going to the second floor. It later shows a male wearing a hoodie walk up to the front desk who waits for N.R. to come down. N.R. holds the elevator while the male lets in two other men wearing hoodies. They go up the elevator to the second floor together.

26. On September 10, 2023, at approximately 10:45 a.m., Catoosa Police officers responded to the Laquinta Inn and Suites to get additional information from

TREJO-ZAMBRANO and SORIA. They reported E.D. was upstairs and knew the female involved in the robbery. Officers accompanied TREJO-ZAMBRANO and SORIA to the room and spoke with E.D. who appeared hesitant to speak with them. E.D. asked SORIA for permission to talk about the robbery and after he nodded his head yes. E.D. provided that a group of friends went out to celebrate her eighteenth birthday the night prior. That N.R. was one of the people at the party and had recently blocked her number. E.D. showed Officer Kinsinger a picture of N.R. and appeared to be nervous. She said she "knew things and did not want to speak on the record" but just wanted to help get TREJO-ZAMBRANO's property back.

27. On September 10, 2023, at approximately 9:45 p.m., TPD Officer Hart took a report regarding a possible kidnapping of E.D. LG. reported she was friends with E.D. and they were at Ruby Red Night Club the previous night for E.D.'s birthday. E.D. was with her boyfriend, SORIA, and his friend TREJO-ZAMBRANO. L.G. reported she learned her friend N.R. set up TREJO-ZAMBRANO for a robbery and he thought E.D. was involved. She received several messages that E.D. was not allowed to leave, individuals had guns, and TREJO-ZAMBRANO brought friends from Arkansas to help him get his property back. Officer Hart later made contact with E.D. who did not want to be "listed on paper" and was hesitant to speak with police. E.D. reported she was not kidnapped and was unharmed.

28. Based on my training and experience, it is common that individuals in domestic violence incidents do not want to cooperate with law enforcement about

what occurred for a variety of reasons, to include emotional connections and fear of retaliation. People in domestic violence situations will commonly defer to an abuser before speaking with police and often give stories that are inconsistent with what they tell friends and family during an incident.

29. On October 6, 2023, P.G. reported to TPD Det. Shea Duff that she was the manager of a restaurant in Sand Springs, Oklahoma, where N.R. used to work. On September 10, 2023, at approximately 3:17 p.m. a young Hispanic male came into the restaurant looking for N.R. The man was speaking to the several employees about N.R. asking if she was there and when she was working next. The man was persistent and seemed suspicious. The encounter was captured on surveillance footage and shown to N.R. who believed the man was Bryan MARTINEZ.

30. On October 11, 2023, S/A Nechiporenko and RAC Brett Williams viewed the firearms booked under Property Receipt Number BU9984 at the Tulsa Police Property Room. The Palmetto State Armory, Dagger Compact, Serial #JJE37863, with suspected silencer (Item #7) was examined and photographs of the suspected silencer were sent to ATF FEO Eve Eisenbise.





29. On October 11, 2023, FEO Eisenbise provided a preliminary report that the silencer is a common firearm silencer, being a device for silencing, muffling, or diminishing the report of a portable firearm, are each a "firearm silencer" as defined in 18 U.S.C. § 921(a)(25); it a silencer by design, construction, and function; therefore, it is also a "firearm" as defined in 26 U.S.C. § 5845(a)(7). Legal possession of this silencer would require that it be registered in the National Firearms

Registration and Transfer Record (NFRTR). Further, that there do not appear to be any marks of identification or serial numbers as required by 26 U.S.C. § 5842. A query was conducted of the NFRTR for all eight males. None of the males had any NFA items registered to them in the NFRTR, and specifically, none of the males had a silencer registered to them. The silencer was not able to be searched as it does not have markings such as a serial number or manufacturer.

30. On October 6, 2023, S/A Nechiporenko searched the Flock license plate reader data base for the 2008 Dodge Charger (AR APX64Y) and 2016 Honda Accord (AR 546ZPF). Both vehicles were captured at the following locations:

- September 15, 2023, 11:10 p.m., at 10850 State Highway 82, Locust Grove, Oklahoma.

- September 16, 2023, 12:03 a.m., East 1st Street/South Lansing Ave, Tulsa, Oklahoma.

31. A Google Maps search for the distance and travel time between 10850 State Highway 82, Locust Grove, Oklahoma, and East 1st Street/South Lansing Ave, Tulsa, Oklahoma, estimated the distance as 47.4 miles with a travel time of 45 minutes. Based on the times and locations of the Flock captures, the vehicles appear to be traveling together.

32. On October 12, 2023, S/A Nechiporenko received security footage from Kum & Go, 701 State Highway 82, Locust Grove, Oklahoma from September 15, 2023, at approximately 11:00 p.m. It shows the Honda Accord and Dodge Charger pull into

the property and park at the fuel pumps at 11:10 p.m. Everyone except

ZAMBRANO-RIVERA is seen exiting the vehicles and going into the store.







Luis Trejo-Zambrano

33. The occupants of the vehicles are observed in the following locations:

- Dodge Charger
  - o Driver: Christopher MARTINEZ
  - o Front Passenger: SABB
  - o Rear Driver's Side: BATEMON
  - o Rear Passenger Side: BURTON
- Honda Accord:
  - o Driver: Bryan MARTINEZ
  - o Front Passenger: TREJO-ZAMBRANO
  - o Rear Driver's Side: ZAMBRANO-RIVERA
  - o Rear Passenger Side: SORIA

34. On October 12, 2023, S/A Nechiporenko searched jail calls for all eight

individuals arrested and booked into David L. Moss Criminal Justice Center. On

September 16, 2023, BATEMON made the following calls to phone number 501-

644-0124 at the following times:

- 1:58 p.m. at approximately 13:35 minutes into the call "Nobody

  claimed their guns so they just gave us misdemeanors and nobody get

20

no felonies. The guns I mean, the guns was the other (expletive) with Goon [TREJO-ZAMBRANO]. He got to go to court and take his gun charges."

- 7:08 p.m. at approximately 15:13 minutes into the call "Yeah, we all ride together. We got our shit at Goon's house. We dropped some shit off at Goon's house. That's what I'm glad about that, like, I'm glad we did that, like when we went to Goon's house, that's when we was in Oklahoma. Fuck. Cuz we went to his house and you know, he...he's...we went to his momma's house and we dropped a lot of shit off, but a (expletive) didn't know a lot of shit was still in their car cuz, (expletive) there were so many bags. Yeah, we would have just like, took our time, we rushin' and shit trying to get to places. We wouldn't have even got lock up. We would have just had the guns, we would have been straight for sure."

35. S/A Nechiporenko reviewed the criminal histories for the individuals and learned the following:

- Only TREJO-ZAMBRANO has a listed address in Oklahoma. The other individuals reside in Northeast and Central Arkansas. Based on the trajectory of travel, their movement is consistent with traveling from Arkansas to Oklahoma.

- BURTON was convicted of felony Possession of a Scheduled Substance with Purpose to Deliver, and Theft by Receiving in Pulaski County, Arkansas on August 22, 2022, in 60CR-22-1452. He was sentenced to 60 months of probation.

- ZAMBRANO-RIVERA was convicted of felony Possession of a Marijuana with Purpose to Deliver, in Washington County, Arkansas on September 28, 2022, in 72CR-22-15. He was sentenced to 36 months of probation.

- SORIA was indicted and charged with felony Possession of Schedule II Controlled Substance in Washington County, Arkansas on January 11, 2023, in 72CR-23-75.

- BATEMON was indicted and charged with Felony Manslaughter in Pulaski County, Arkansas on September 11, 2023, in 60CR-23-3725.

- TREJO-ZAMBRANO was indicted and charged with felony Simultaneous Possession of Drugs and Firearms, Possession of a Schedule VI Controlled Substance with the Purpose to Deliver, Fleeing (by Vehicle with Extreme Indifference), and Possession of Methamphetamine, Heroin, or Cocaine with the Purpose to Deliver in Benton County, Arkansas, on October 3, 2022, in 04CR-22-1564. He was indicted and charged with felony Simultaneous Possession of Drugs and Firearms, Possession of a Schedule II Controlled Substance, Theft by Receiving Firearm Valued at $2,500, and

Possession of a Schedule IV or V Controlled Substance on February 22, 2023, in Washington County, Arkansas in 72CR-23-321.

36. On October 12, 2023, S/A Nechiporenko reviewed Firarms Trace Summaries provided by the ATF National Tracing Center (NTC) for the ten (10) firearms seized by Tulsa Police Department on September 16, 2023. The Firearms Trace Summaries provided information, including date, FFL, location, and purchaser, regarding the transfer of a firearm from a Federal Firearms Licensee (FFL) to a purchaser. Nine (9) out of the ten (10) firearms were purchased in Arkansas. The remaining firearm, a Zastava PAP M85 PV, 5.56x45mm, Serial #M85PV001787, was purchased in Missouri.

37. A review of various law enforcement data bases shows cell phone numbers associated with the following:

- Kalob BURTON provided his cellphone number was 501-902-3469 to TPD when he was arrested and booked on September 16, 2023. On November 11, 2023, the number was searched in Cash App which showed it was linked to an account with the vanity name, "Kalob Burton". The phone number was also searched in Leads Online, a database which tracks pawn shop tickets. BURTON listed on 501-902-3469 on a pawn ticket from May 12, 2023.

- Marcos ZAMBRANO-RIVERA provided his cellphone number was 479-283-7604 to TPD when he was arrested and booked on September

23

16, 2023. ZAMBRANO-RIVERA was searched in Lexis Nexis

Accurint which showed 479-283-7604 as his phone number.

38. Based on the totality of the circumstances, to include but not be limited to the combined statements, coordinated movements, types and placement of firearms within both vehicles, and location of their arrest, this appears to be a coordinated effort by the suspects to gather firearms, body armor, and masks either to retaliate or kidnap individuals involved with the robbery of TREJO-ZAMBRANO.

39. I know through my training and experience that those persons involved in conspiracies to commit crimes, use cellular communication devices to maintain contact with cohorts and accomplices, and to coordinate their crimes. These persons also use phone calls, text messages, electronic mail and social media such as Facebook, Twitter, and Instagram for the same purposes. These digital messages often contain details of the criminal conspiracy to include: the participants of the crime; the weapons/tools needed to commit the crimes; the location of potential targets; and the plan and timing for committing the crimes. These people also use their devices to take photos of their firearms and share via messaging and social media services. Viewing and retrieving the contents of the cellular telephones would be useful to show the persons involvement in the unlawful possession of a firearm.

40. Based on my training and experience, I know that individuals involved in criminal activity often use cell phones and other electronic devices to further their trade by conducting business on them via text messages and phone calls. Individuals

24

involved in violent crime also trade images of firearms and/or items from their illegal activity on their phone as well. I also know from training and experience that:

- Cellular telephones are almost always used by persons engaging in criminal activities as a means of communication. They will communicate by verbal conversations, digital text messaging, and/or sending photographs to one another.

- Reviewing historic cellphone communication history and historic location history is circumstantial evidence of a coordinated efforts to meet and travel together as a group.

41. On November 15, 2023, I applied for a federal search warrant for the Devices. The search warrant was approved and signed by the Honorable United States Magistrate Judge Jayne in the Northern District of Oklahoma. 23-MJ-629-JFJ.

42. Special Agents attempted to coordinate execution of the search warrant with multiple agencies including Homeland Security Investigations (HSI), Tulsa Police Department – Special Investigations Division, and Tulsa Police Department – Crimes Against Children. Due to staffing constraints and significant backlogs; the search warrant was unable to be executed within fourteen (14) days. On December 5, 2023, arrangements were made with the United States Secret Service and Wagoner County Sheriff's Office to execute a search warrant for the Devices.

## Technical Terms

43. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

    b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic films. Digital cameras use a variety of fixed and removable storage media to store

their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

d.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

e.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

44. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online https://www.apple.com/iphone/, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA." In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

**Electronic Storage and Forensic Analysis**

45. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period on the device. This information can sometimes be recovered with forensics tools.

46. I know that cellular telephones are often equipped with digital cameras and those phones possess the capability to transmit and/or store electronic images. I know that in many cases, cellular telephones maintain photographs of illegal activities to include evidence of illegal possession of firearms, explosive devices, or materials used in the construction of explosive devices and the illegal purchase or acquisition of firearms, explosives devices, or materials used in the construction of explosive devices. These photos are sometimes stored in their cellular phones and often are transmitted or sent from one electronic media device to another. I also know that cellular phones may also contain notes regarding potential illegal acts that are recorded by the subject who possesses the electronics. Furthermore, I know that text messages, emails are often used by two or more persons to communicate information regarding the illegal possession or acquisition of firearms, explosive devices, or materials used in the construction of explosive devices and/or violent crime and other illegal activities, between principals and co-conspirators of those crimes.

29

47. I know that cellular telephones are utilized by most individuals in the United States and have become a staple of communication between individuals using text messaging, visual and audible communications (telephone calls and FaceTime type communications) as well as applications like "Facebook Messenger". Additionally, individuals utilize their cellular devices to take pictures, keep notes, as a GPS (global positioning System) device, and even to conduct illicit or illegal activity. Communications on phones are kept for long periods and transferred from one phone to another when replaced. This is done using Cloud storage and direct transfer conducted at the time of purchase or by the individual themselves. Individuals utilize this method as not to lose data that is stored on the phone such as contacts, photos, notes, and other important information to the individual. This data includes contacts used to conduct illegal activities to include construction or assembly of illegal explosive devices.

48. Based on my training and experience, I know that individuals involved in criminal activity often use cell phones and other electronic devices to further their trade by conducting business on them via text messages and phone calls. Individuals involved in violent crime also trade images of firearms, explosive devices, or materials used in the construction of explosive devices and/or items from their illegal activity on their phone as well. I also know from training and experience that:

    a. Cellular telephones are almost always used by persons engaging in criminal activities as a means of communication. They will communicate by verbal

conversations, digital text messaging, and/or sending photographs to one another.

b. Persons engaged in criminal activities carry and possess firearms or explosive devices during and in relation to and in furtherance of crimes. They also photograph themselves and others with controlled substances, firearms or explosive devices, and money proceeds. Such photographs are often kept in digital form on cell phones.

c. Cellular telephones may also contain notes, emails, and text messages regarding money laundering, or inquiries for firearms, explosive devices, or materials used in the construction of explosive devices by the subject who possesses the cellular telephone.

d. Text messages and e-mails are often used by two or more persons to communicate information regarding illegal activities between two telephones or between one telephone and a personal computer. This information can include directions for deliveries, stash locations, prices, cell phone contact numbers, and instructions.

e. Cellular telephones often contain stored phone numbers and contact information of individuals that conduct business with other co-conspirators that possess the cellular telephone.

f. Persons prohibited from legally possessing firearms or explosive devices frequently do not obtain them by a traditional means (such as through licensed dealers which require background checks and

31

paperwork/documentation) and instead use third-party suppliers. Many of these third-party suppliers are online marketplaces such as Armslist (www.armslist.com) or Gun Broker (www.gunbroker.com), or ordinary construction supply stores or gas stations in the case of homemade explosive devices, while other third-party transactions take place through the communication between two individuals in a private sale transaction, which takes place outside of the restrictions of the federal government that would at minimum document the sale or transfer.

g. An additional avenue prohibited persons frequently use to obtain firearms is through the straw purchase of a firearm which is done when a non-prohibited person buys a firearm through traditional means for a prohibited person, at the direction of the non-prohibited person to include style, make, model, and caliber and sometimes even the individual to buy from. Frequently, this communication between the non-prohibited and prohibited person takes place via cellular device to include text messages with both instructions for purchase and pictures of firearms or explosive devices to be obtained or sold.

h. Additionally, I know from my training and experience that many individuals who construct homemade explosive devices often conduct extensive research online regarding the needed materials and how to effectively assemble their desired explosive device. Internet history data found in cell phones is likely to show a record of a search history for

instructions on explosives, as well as a history of visiting websites with information on the assembly of explosives and required materials.

    i.   In summary, prohibited persons frequently use cellular phones to obtain their illegally possessed firearms or explosive devices whether it be through third party web sites, private purchase, or through straw purchase.

49. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

    a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b.   Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

33

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

50. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

51. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

52. *Methods of examination*. In conducting this examination, law enforcement personnel may use various methods to locate evidence and instrumentalities of the crime(s) under investigation, including but not limited to undertaking a cursory inspection of all information within the Device. This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with stored cellular device data, such as pictures and videos, do not store as searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications associated with a cellular device, as it is impossible to know in advance all of the unique words or phrases investigative subjects will use in their communications. Consequently, often many communications in cellular device data that are relevant to an investigation do not contain any searched keywords.

**Conclusion**

53. Based on the information above, I submit that there is probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

54. I request to be allowed to share this affidavit and the information obtained from this search with any government agency, to include state and local agencies investigating or aiding in the investigation of this case or related matters, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions from this matter.

Respectfully submitted,

Ben Nechiporenko
Special Agent
Bureau of Alcohol, Tobacco, Firearms &
Explosives

Subscribed and sworn to by phone on December __6__, 2023.

SUSAN E. HUNTSMAN
UNITED STATES MAGISTRATE JUDGE

36

## ATTACHMENT A

### Property to be Searched

The property to be searched is a red Apple iPhone, an Apple iPhone with white graphic case, a red Apple iPhone, a white Apple iPhone, a blue Apple iPhone, a rose gold with black Otter Box brand case Apple iPhone, and a silver Samsung flip phone, hereinafter the "Devices." The Device is currently located at the Tulsa Police Department in Tulsa, Oklahoma.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

  

| Apple iPhone (Red) | Apple iPhone (White | Apple iPhone (Red) |
|---|---|---|
| TPD Item #27 | Graphic Case) | TPD Item #29 |
|  | TPD Item #28 |  |

| | | |
|---|---|---|
|  |  |  |
| Apple iPhone (White with Black/Brown Case) TPD Item #32 | Apple iPhone (Blue Case) TPD Item #36 | Apple iPhone (Rose Gold with Black Otterbox Brand Case) TPD Item #42 |
|  | | |
| Samsung Flip Phone (Silver) TPD Item #43 | | |

## ATTACHMENT B

### Particular Things to be Seized

All records on the Device described in Attachment A that relate to Title 18

U.S.C. § 922(g)(1) – Felon in Possession of a Firearm or Ammunition, Title 18

U.S.C. § 922(d)- Disposing of Firearm or Ammunition to a Person Under Indictment

or Convicted Felon, Title 18 U.S.C. § 924(b)- Transporting or Receiving a Firearm or

Ammunition in Interstate Commerce with Intent to Commit a Felony, and Title 18

U.S.C. § 924(h)- Conspiring to Transfer or Receive a Firearm or Ammunition to

Commit a Felony including:

1. Records relating to communication with others as to the criminal offense(s) listed above; including incoming and outgoing voice messages; text messages; emails; multimedia messages; applications that serve to allow parties to communicate; all call logs; secondary phone number accounts, including those derived from Skype, Line 2, Google Voice, and other applications that can assign roaming phone numbers; and other Internet-based communication media;

2. Records relating to documentation or memorialization of the criminal offense(s) listed above, including voice memos, photographs, videos, and other audio and video media, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos, including device information, geotagging information, and information about the creation date of the audio and video media;

3.  Records relating to the planning and execution of the criminal offense(s) above, including Internet activity, firewall logs, caches, browser history, and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, records of user-typed web addresses, account information, settings, and saved usage information;

4.  Application data relating to the criminal offense(s) above;

5.  Threating communications related to the criminal offense(s) listed above;

6.  Information related to co-conspirators, stash house locations used to store firearms, destructive devices, or materials used to construct destructive devices, admissions of criminal offense(s) related to the offense(s) listed above and information related to the acquisition or attempted acquisition of other destructive devices, components, firearms or ammunition in the future or already completed and related identifying information;

7.  Any information related to sources of acquiring destructive devices, components, firearms, co-conspirators, aiders and abettors of information related to the illegal possession of firearms as well as others (including names, addresses, phone numbers, or any other identifying information); information relating to instructions for transportation, obtaining and storing illegally possessed firearms, and information relating to means of transportation for illegally possessed destructive devices or firearms;

2

8. All information, data, and photographs related to the possession, acquisition, and use of destructive devices, components, and/or firearms;

9. All bank records, checks, credit card bills, account information, and other financial records.

10. Evidence of user attribution showing who used or owned the Device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, phone books, saved usernames and passwords, documents, and browsing history;

11. All records and information related to the geolocation of the Device(s) from July 16, 2023 to September 16, 2023;

12. All records and information related to the coordination, agreement, collaboration, and concerted effort of and with others to violate the criminal statutes listed above.

As used above, the terms "records" and "information" include all the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

3